PER CURIAM.
hThe state filed a delinquency petition in the Juvenile Court for the Parish of Orleans charging defendant with distribution of heroin in violation of La.R.S. 40:966(A)(1). After a hearing conducted on September 30, 2010, the court adjudicated defendant delinquent and ordered him committed to the custody of the Department of Public Safety and Corrections for a period not to exceed one year. On appeal, the Fourth Circuit set aside the juvenile court’s adjudication and disposition order on grounds that “any rational trier of fact, after viewing all of the evidence favorably to the prosecution, must have a reasonable doubt as to the defendant’s guilt.” State in the Interest of C.D., 11-0121 (La.App. 4th Cir.6/29/11), 69 So.3d 1219. We granted the state’s application for review and reversed the decision below because the court of appeal erred in substituting its appreciation of the evidence presented at the delinquency hearing for that of the fact finder.
The evidence adduced at the delinquency hearing showed the following. On June 28, 2010, New Orleans Police Officer Rafael Dobard, assigned to the Narcotics Unit where he had worked for over six years, testified he received a confidential informant’s tip that heroin and unidentified pills were being sold from a house at 2033 Wagner Street, in the Fischer Housing Development. At approximately 10:30 a.m. on June 28, 2010, Dobard set up a surveillance unit to investigate possible *1274 drug trafficking. Additional police officers were in the ^neighborhood to act as the “take-down” team for any individuals observed in transactions with the occupants of the residence.
Through binoculars from a location and at a distance he would not describe for fear of revealing his surveillance point, Dobard observed one or two transactions in which unknown individuals would walk up to 2033 Wagner Street, and engage in brief conversation at the door with a brown-complected black male who was wearing a black t-shirt and black shorts. Dobard viewed the individuals and the black male exchange an unknown amount of currency for an unknown item. After one of the individuals left, Dobard sought to have his “take-down” team arrest him, but they were unsuccessful in finding him. Later that afternoon, Dobard observed a black female approach the residence in a champagne-colored Buick Regal, speak with the black male under observation at the front door, and both went to the side of the house. Once there, the black male reached into his pants, retrieved an item and gave it to the woman in exchange for money. The female then returned to her car and drove out of the development. Dobard radioed his take-down team to alert them and continued to watch the residence. According to the officer, the development buildings, styled something like townhouses, had both front and back entrances, and his surveillance point provided him with a view of the front door.
Within a minute of Dobard’s call, the take-down team pulled over the departing female, later identified as Mary Charles, in the Buick Regal only two blocks away. As the officers were removing her from the vehicle, Charles threw a foil packet clenched in her right hand to the ground. The officers retrieved the packet, conducted a field test on the brown powder concealed within, and placed Charles under arrest. After the take-down team notified him the powder was heroin, Dobard relayed this information to another officer to prepare a search L warrant for the residence while he continued his surveillance of the location for approximately one more hour. Once the warrant was prepared and presented to a magistrate for signing, Do-bard left the scene to retrieve his own police cruiser. The officer observed defendant walk back into the house before he left. Dobard assigned another officer to keep the residence and black male under surveillance in his absence.
Shortly after 4:00 p.m., the officers returned to the residence to execute the search warrant, and Dobard was part of this police team. A search of the house failed to locate the black male among the five or six individuals on the scene, some of whom were arrested. However, Dobard then noticed his suspect standing across the street. The officer observed the black male no longer wore black shorts and a black t-shirt but had on a yellow, black, and white plaid shirt, and blue jeans. Defendant was placed under arrest and $138 was seized from him as evidence. No drugs or drug contraband were seized. Dobard was the only police officer involved in the investigation to testify at the hearing.
Defendant’s mother testified he was helping her move during the day, and he had only left her around 4:30 to 5:00 p.m. She later testified he left around 1:30-2:00 p.m. to go to a nearby house on Hendee Street occupied by a woman identified only as the “candy lady.” She further testified the police took defendant from the “candy lady’s” house and brought him to Wagner Street, where they then arrested him. Defendant’s mother could see both 2033 Wagner Street and the “candy lady’s” home on Hendee street from her own *1275 home on Vespasian Street. The defense also called Annaise Rashad Esteen, a resident of 2033 Wagner Street. Esteen acknowledged that he had pled guilty to possession of a stolen firearm and possession of pills stemming from the search of the residence on June 28, 2010. Esteen testified he knew defendant from the neighborhood, but claimed defendant |4had never been to his house or porch which is frequently crowded by other residents of the Fischer Housing Development. “We have everybody on our porch,” Esteen testified, “I don’t tell them nothing.” Among the crowd on his porch was an individual who looked similar to defendant. Esteen described the man as having a “red” skin complexion and a chipped tooth. According to Esteen, the man is of the same height as defendant but lighter complected.
James Baker testified for the defense he was also at the “candy lady’s” house and was arrested at the same time as defendant. Baker stated he had been with defendant for “about a hour and 30 minutes,” at the home of his friend next to the “candy lady” house before their arrest, and he never saw defendant go to Wagner Street residence. For his part, defendant testified he was arrested because “they thought I looked like somebody,” although, in his opinion, he did not resemble anyone else in the development. When arrested, defendant told police they had the wrong person, and denied he had been on Wagner Street until the police arrested him at the “candy lady’s” house and brought him there.
Recalled by the defense, defendant’s mother testified that a man named “Earnest” was probably the individual the police and other persons around the neighborhood confused for her son. She described “Earnest” as “red” in skin tone, in her terms, “brown skinned,” just as her son, and stated that the only difference is that Earnest “got a crack [tooth].”
In vacating the juvenile court’s delinquency adjudication of defendant, the court of appeal noted the state’s case rested entirely on the uncorroborated testimony of Officer Dobard, which, in the court’s view, “[did] not negate every reasonable probability of misidentification, especially given C.D.’s different clothing [at the time of arrest], the lack of drugs on his person, and his lack of connection to this part of the neighborhood and the 2033 Wagner residence.” C.D., 11-0121 at 7, 69 So.3d at 1223. Although acknowledging that “eye witness testimony alone can be sufficient evidence to satisfy the State’s burden,” the court of appeal observed that “Louisiana jurisprudence has recognized that there are instances in which ‘numerous eccentricities, unusual coincidences and lack of corroboration’ make such testimony so unreliable that even a reasonably pro-prosecution rational fact finder must have a reasonable doubt about the identification.” Id., 11-0121 at 7-8, 69 So.3d at 1223 (quoting State v. Mussall, 523 So.2d 1305, 1311 (La.1988)). In concluding the present case offered one such instance, the court of appeal took into account the failure of the state to produce any evidence in support of its hypothesis that defendant could have changed clothes and slipped out of the back of 2033 Wagner undetected by police surveillance even as he crossed the street and stood in front of the residence where Dobard found him after the officer returned to the scene with the warrant team. Id., 11-0121 at 8, 69 So.3d at 1224. The court of appeal further noted the police had made no attempt to bring Mary Charles back to the scene to identify the person who sold her the heroin, an omission that spoke “volumes” about the state’s failure to corroborate Dobard’s eyewitness identification of defendant. Id., 11-0121 at *1276 9, 69 So.3d at 1224. Finally, the court of appeal emphasized that juvenile delinquency proceedings are essentially civil in nature, State in the Interest of Batiste, 367 So.2d 784, 789 (La.1979), and that review of a delinquency adjudication is therefore subject not only to the due process standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), but also to a broader standard by which an appellate court reviews both the facts and law, specifically, the trial court’s factual findings, for clear or manifest error, “to determine whether there is sufficient evidence to satisfy the standard of proof beyond a reasonable doubt.” C.D., 11-0121, p. 6, 69 So.3d at 1223 (citation 1nomitted). Given the loose ends in the state’s case, the court of appeal concluded “the trial court was clearly wrong in determining that the state had proven the identification of C.D. beyond a reasonable doubt.” Id., 11-0121 at 10-11, 69 So.3d at 1224-25.
However, as a matter of due process, the court of appeal erred in losing sight of the basic principle on review that the rational fact finder test of Jackson v. Virginia, “does not permit a reviewing court to substitute its own appreciation of the evidence for that of the [fact finder].” State v. Lubrano, 563 So.2d 847, 850 (La.1990) (citing State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983)). Thus, an appellate court should ordinarily not assume “the role of the fact-finder to weigh the respective credibilities of the witnesses” and thereby “second guess the credibility determinations of the trier of fact beyond ... sufficiency evaluations under the Jackson standard of review.” Graffagnino, 436 So.2d at 563.
As the court of appeal acknowledged in the present case, “[e]yewitness testimony alone is usually sufficient in the mill run of cases.” Mussall, 523 So.2d at 1311. Mus-sall stands as the single, sui generis, exception to that rule in this Court’s jurisprudence, and it is distinguished by its truly bizarre facts. Id., 523 So.2d at 1312 (“With the addition of the eccentricities of [the victim’s] story any rational trier of fact must take a dim view of the state’s case even in its most favorable light: a frugal young man who saves a nest egg on minimum wage, responds to a call out of the blue from a virtual stranger about a boat owned by the caller’s friend by liquidating his $4,000 savings, borrowing $2,000 more from his sister at 18 ½%, and rushing off to meet the caller with $6,000 in his pocket, without first inspecting the boat or talking to the owner of the boat about price; and an armed robber who calls in advance of the crime to renew acquaintances with his |7victim, uses his correct name and leaves his home phone number so that he cannot fail to be identified.”).
The decision in Mussall has no bearing on the outcome in the present case because there was nothing “eccentric” or “unusual” about the testimony of Officer Dobard, an experienced narcotics officer who conducted a routine drug investigation in a routine manner, a “mill run case” in which the police acted on a tip from a confidential informant, established a surveillance of the suspect location, and observed what then happened in an attempt to verify the information. See, e.g., State v. Williams, 250 La. 64, 193 So.2d 787 (1967); State v. Robertson, 02-0156 (La.App. 4th Cir.2/12/03), 840 So.2d 631; State v. Lawrence, 02-0363 (La.App. 4th Cir.5/8/02), 817 So.2d 1216; State v. Bryant, 98-1115 (La.App. 4th Cir.8/4/99), 744 So.2d 108. Officer Dobard would not give his location or exact distance from 2033 Wagner Street but he did state he was “not 200 feet” away and was using a pair of binoculars. He then observed defendant conducting two or possibly three transactions, including the exchange with *1277 Mary Charles. The officer thus had more than an ample opportunity to view his suspect, an important factor bearing on the reliability of eyewitness identification testimony. Mamon v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (reliability is the lynchpin of the admissibility of identification testimony and is determined by several factors, foremost of which is the opportunity to view).
In addition, while the state failed to produce “surveillance video, maps, or the like,” C.D., 11-0121 at 8, 69 So.3d at 1224, to show the various entrance and exit points of 2033 Wagner Street, Dobard testified explicitly the residence had front and back approaches. His surveillance point had afforded him a view of the front porch and the officer assigned to watch the house while Dobard went for his police cruiser to accompany the warrant team presumably continued the 18surveiIIance from Dobard’s vantage point. That the officer may have missed defendant’s departure, perhaps through the back exit, and subsequent appearance across the street wearing different clothing than worn by the suspected heroin dealer, did not negate the reasonable probability Dobard made a reliable identification, based his hours-long observation of the seller through binoculars, because Dobard remembered what defendant looked like, notwithstanding he had changed outfits. Kyles v. Whitley, 514 U.S. 419, 466, 115 S.Ct. 1555, 1581, 131 L.Ed.2d 490 (1995) (Scalia, J., dissenting) (“Facial features are the primary means by which human beings recognize one another. That is why ... the Lone Ranger wears a mask instead of a poncho ... and ... why a criminal defense lawyer who seeks to destroy an identifying witness by asking You admit that you saw only the killer’s face?’ will be laughed out of the courtroom.”). Given the circumstances under which Dobard conducted the surveillance and viewed the heroin trafficker, the failure of the police to keep Mary Charles on the scene for two or more hours until the surveillance wrapped up and the warrant for 2033 Wagner Street was executed may have reflected no more than a rational assessment by officers on the scene that Dobard was in a position to make a reliable identification and that they did not need additional input from a heroin user.
Argument of counsel at the close of the hearing brought all of the circumstances considered by the court of appeal to the attention of the juvenile court, including discrepancies in the defense case with respect to where and how defendant spent the afternoon before his arrest and whether defendant did, or (in his opinion) did not resemble anyone else in the Fischer Housing Development. In the end, the juvenile court found Dobard’s testimony sufficient to negate any reasonable probability of misidentification and because that credibility determination appears rationally based on the evidence presented at the ^adjudication hearing, the court’s finding forecloses second guessing by an appellate court under the rational fact finder test of Jackson v. Virginia. Moreover, even under a broader, civil standard of review, we find no clear or manifest error in the trial court’s credibility determination. See Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989) (“When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings.... [unless] documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story.... a factfin-der’s finding ... based on its decision to credit the testimony of one of two or more witnesses ... can virtually never be manifestly erroneous or clearly wrong.”) (citing, *1278 inter alia, Mussall); see also Foley v. Entergy Louisiana, Inc., 06-0983, p. 10 (La.11/29/06), 946 So.2d 144, 153 (“If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.”) (citation omitted).
However, defendant further argues that, even assuming the state’s case negated any reasonable probability of misidenti-fication, the evidence at trial nevertheless failed to connect him to the packet of heroin discarded by Mary Charles when Officer Dobard’s back-up team stopped her. Given its view about the reliability of Dobard’s identification, the Fourth Circuit did not address this aspect of defendant’s challenge to the sufficiency of the evidence. We may nevertheless exercise our supervisory authority to consider this claim because the failure of the state’s case on an essential element of the offense charged, in the present case, delivery of the heroin to Mary Charles by defendant, remains subject 110to review “regardless of how the error is brought to the attention of the reviewing court.” State v. Raymo, 419 So.2d 858, 861 (La.1982); see State v. Celestine, 95-1393, p. 3 (La.1/26/96), 671 So.2d 896, 897 (in narcotics cases, distribution is “defined as the ‘delivery’ or transfer of possession and control over controlled substances.”)(citing La.R.S. 40:961(9) & (13); State v. Martin, 310 So.2d 544, 546 (La.1975)).
Defendant argues that because Mary Charles made no statements implicating him in the distribution of the single heroin packet found in her possession, and did not identify him as her supplier, the state’s case failed to negate the reasonable possibility she may have already had the heroin in her possession and obtained it from another source before she stopped at the address on Wagner Street. One such source may have been Shedrick Myles, whose name appears under the same item number assigned to Charles’s arrest and on the criminalist’s report regarding the test results on the packet of heroin, although Detective Dobard testified Mary Charles was alone in the Buick Regal and testimony of the back-up team members at the hearing failed to mention the presence of anyone else accompanying Charles when they pulled over her car.
The record does not reveal what connection, if any, Shedrick Myles may have had to the recovery of the heroin packet from Charles.[1] However, the evidence at the hearing established that Officer Dobard’s back-up unit stopped |nMary Charles less than a minute and no more than two blocks away after receiving his report he had observed an apparent drug transaction conducted at the side of the Wagner Street address. The timing of the stop supported a rational inference by the juvenile court judge that the object clenched in Mary Charles’s hand as she drove away from the scene was the same object Dobard had *1279 witnessed defendant transfer to Charles only moments before, even assuming she was not alone in the car when the police stopped the vehicle. Cf. State v. Graham, 422 So.2d 123, 130 (La.1982)(“In comparison with the prosecution’s hypothesis of defendant’s guilt, which is consistent overall with the evidence, the defendant’s circumstantial theory of innocence is remote.”). We therefore find no clear error in the juvenile court’s determination defendant delivered the packet of heroin to Charles.
The decision of the court of appeal is therefore reversed, the juvenile court’s adjudication of delinquency is reinstated, and this case is remanded to the juvenile court for purposes of executing its disposition order.
JOHNSON, Justice, dissents and assigns reasons.

. According to Detective Dobard, several persons were arrested inside the Wagner Street residence during execution of the search warrant and a Criminal District Court docket master indicates that Shedrick Myles, Mary Gasper, and Annaise Esteen were charged together with various offenses arising out of their arrests on June 28, 2010. As he confirmed in his testimony at the hearing, the prosecution led to Esteen’s guilty pleas to possession of a firearm and Schedule IV drugs. Gasper and Myles also pleaded guilty to possession of heroin and defendant supposes Mary Charles is, in fact, Mary Gasper. In any event, whatever the basis for the charge against Myles, testimony at the hearing placed a packet of heroin in the hand of the woman driving the Buick Regal less than a minute after Dobard reported the apparent drug transaction involving defendant and the driver of the Regal who subsequently identified herself as Mary Charles.